# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DARLENE CHAPDELAINE,

*Plaintiff*,

v.

ROBERT L. DESJARDIN, ET AL.

*Defendants*.

No. 3:20-cv-00779 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

On November 22, 2018, Plaintiff Darlene Chapdelaine was arrested by Connecticut State Troopers Robert L. Desjardin and Jason N. Deojay. She brings this suit under 42 U.S.C. § 1983 and state law against Desjardin, Deojay, and Defendants John Gregorzek, John Aiello, and James Rovella alleging, among other things, that her arrest was made without probable cause and with excessive force in violation of the Fourth Amendment.[1] Chapdelaine also brings several claims under state law related to this arrest and her interactions with Defendants after it. Defendants now move for summary judgment. They argue that Chapdelaine's Fourth Amendment claims fail because she cannot demonstrate favorable termination of the charges for which she was arrested and because Defendants did not violate the Fourth Amendment or are entitled to qualified immunity. *See* ECF No. 56-1. Defendants also claim this Court lacks jurisdiction under the *Younger* abstention doctrine. For the reasons set forth below, I grant in part and deny in part the motion for summary judgment.

---

[1] Defendants write that John Aiello and James Rovella had all claims against them dismissed in a prior ruling. ECF No. 56-1 at 2. Previously, I dismissed certain classes of claims entirely and dismissed the § 1983 claims against Aiello and Rovella. *See* ECF No. 48. Some claims against these defendants remain, however, such as claims of trespass against Aiello, ECF No. 26 at 57 ¶ 206, and a common law conspiracy claim against all defendants, ECF No. 26 at 61 ¶¶ 215-16.

## I.    FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits.[2] All facts are undisputed unless otherwise indicated.

On November 22, 2018, Shannon Demello called 911 and reported that Chapdelaine was intoxicated and had "pushed and punched" Demello's intoxicated elderly grandfather, Bruce Serwecki, at Chapdelaine's home. ECF No. 56-8 at 1 ¶ 1. Demello also stated that Chapdelaine was yelling at Serwecki, who was 75 years old, and was "pushing him onto the floor, punching him." ECF No. 56-2 at 3.  Defendants Desjardin and Deojay are Connecticut State Troopers and were dispatched to Chapdelaine's home in response to Demello's 911 call. ECF No. 56-8 at 1 ¶ 3. They were informed by Trooper Esposito, a Connecticut State Trooper who received the 911 call from Demello and dispatched Desjardin and Deojay, ECF No. 63-2 at 27, that that there was "a disturbance," ECF No. 56-2 at 6. The computer-assisted dispatch (CAD) system informed Deojay that the 911 caller "is reporting that her grandfather is intoxicated and Darlene Chapdelaine is pushing him down. His name is Bruce Serwecki age 75." ECF No. 56-2 at 8.[3]

---

[2] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." This Court is "under no 'obligation . . . to perform an independent review of the record to find proof of a factual dispute' if the non-moving party fails to designate specific facts showing a genuine dispute of material fact." *Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) (citations omitted); *accord Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Court not required to assist parties who file deficient Local Rule 56 Statements by conducting "an exhaustive search of the entire record before ruling on a motion for summary judgment").

[3] Defendants have not cited any evidence that Trooper Esposito shared the specific contents of the 911 call with Desjardin or Deojay. *See* ECF No. 56-8 at 1 ¶¶ 1-3 (citing the 911 call and transcript for their contents but failing to establish that Desjardin and Deojay were informed about the contents of the call before they arrested Chapdelaine). There is, however, evidence that Deojay viewed the CAD remarks before arriving at Chapdelaine's home. ECF No. 63-2 at 64 (Deojay stated "he usually read the CAD remarks when responding to calls, and added that he must have before arriving at Chapdelaine's residence"). And though it is not clear whether Desjardin and Deojay were aware of the contents of the 911 call, they may be able to rely on the knowledge of Trooper Esposito, a law enforcement official, under the collective knowledge doctrine. *See United States v. Colon*, 250 F.3d 130 (2d Cir. 2001) ("an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known

When Desjardin and Deojay arrived at Chapdelaine's home, they observed Shannon

Demello in a truck in the driveway, Bruce Serwecki standing outside of this vehicle bleeding

from his hands, and Chapdelaine "stumbling near them." ECF No. 56-8 at 1 ¶ 4; ECF No. 56-3 at

3, 12. Though Chapdelaine denies that she was intoxicated and assaulted Serwecki, she does not

challenge that the CAD remarks available to Desjardin and Deojay noted that the 75-year-old

Serwecki was intoxicated and had been assaulted by Chapdelaine. *See* ECF No. 63-17 at 1-2 ¶¶

1, 2 (Chapdelaine admitting to information conveyed in 911 call and not mentioning CAD

remarks). Nor does Chapdelaine dispute the scene that Defendants Desjardin and Deojay saw

when they arrived at her home. *See id.* at 2 ¶ 4 (disputing only the cause of the bloody hands, not

what the officers observed).

After arriving at Chapdelaine's home, Deojay began interviewing Bruce Serwecki. ECF

No. 56-8 at 1 ¶ 6; ECF No. 56-3 at 2, 12. Serwecki stated that he "wanted to get out of here" and

that he did not "want to be here." ECF No. 56-6 at 10:36:30-10:36:41am. When Deojay gestured

to Serwecki's bloody hands and asked if he fell down, Serwecki replied "yeah." *Id.* at 10:37:04-

10:37:09am. Chapdelaine repeatedly interrupted this interview by speaking over Serwecki,

Desjardin, and Deojay. *See id.* at 10:36:43-10:37:28am; *see also* ECF No. 56-8 at 2 ¶ 7; ECF No.

63-17 at 3 ¶ 7 (Chapdelaine denying but providing explanation and citing evidence that

supports). Between these interruptions, Desjardin asked Chapdelaine if she was handicapped, to

which she replied that she was and that she "just had major back surgery." ECF No. 56-6 at

10:37:04-10:37:11am; *see also* ECF No. 56-3 at 16 (Desjardin writing in supplemental report

that Chapdelaine "did mention numerous times that she had previous back surgery"). Desjardin

---

by other law enforcement officials initiating or involved with the investigation"). I need not decide whether
Desjardin and Deojay could rely on Trooper Esposito's knowledge; as I discuss below, the CAD remarks and
dispatch call about a disturbance, corroborated by the on-scene observations of Desjardin and Deojay, are sufficient
to find probable cause.

responded that he "[didn't] care." ECF No. 56-6 at 10:37:10-10:37:17am. After mentioning her

surgery, Chapdelaine then asked for help with grabbing her dog; Desjardin replied that "it's your

fucking dog, you grab her." *Id.* at 10:36:45-10:37:17am. As Chapdelaine and Serwecki were

speaking, Desjardin and Deojay noticed that both smelled of alcohol. ECF No. 56-3 at 3, 12, 15;

*see* ECF No. 63-17 at 2-3 ¶ 5 (Chapdelaine admits to "one sip" of a "Bloody Mary" and fails to

cite any other contrary evidence); ECF No. 63-2 at 50 (internal affairs investigator records that

Chapdelaine admitted to having "one drink of Bloody Mary"). After a few seconds of

interruption by Chapdelaine, Desjardin twice ordered Chapdelaine to "be quiet" while he and

Deojay interviewed Serwecki. ECF No. 56-6 at 10:37:21-10:37:25am; *accord* ECF No. 56-8 at 2

¶ 8.[4]

The parties disagree about the events that immediately followed Desjardin's order for

Chapdelaine to be quiet. In Defendants' version of events, Chapdelaine approached Desjardin

and "swung her cell phone in his face." ECF No. 56-8 at 2 ¶ 9; *accord* ECF No. 56-4 at 14-15

(Demello saw Chapdelaine "swing at one of" the officers). Desjardin then ordered Chapdelaine

to remove her phone from his face, which she refused to do. ECF No. 56-8 ¶ 10; ECF No. 56-6

at 10:37:24-10:37:26am. After this refusal, Desjardin pushed Chapdelaine's "cell phone and

hand away." ECF No. 56-8 at 2 ¶ 11; ECF No. 56-3 at 3, 13, 15. Desjardin then attempted to

handcuff Chapdelaine, but "she pushed her hands away preventing him from doing so." ECF No.

56-8 at 2 ¶ 12; *accord* ECF No. 56-3 at 3, 13. So Desjardin "placed [Chapdelaine] in the prone

---

[4] Chapdelaine denies receiving the order to be quiet. ECF No. 63-17 at 3 ¶ 8. But the video evidence makes plain that Desjardin twice told Chapdelaine to "be quiet." ECF No. 56-6 at 10:37:21-10:37:24am. And Chapdelaine cannot resist summary judgment by denying facts plainly shown on video of the incident. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him"). In any event, Chapdelaine does not cite any evidence supporting this denial, instead citing a section of the internal affairs report about her arrest that discusses whether any orders were given when Desjardin attempted to cuff her. ECF No. 63-2 at 55. This citation does not support Chapdelaine's denial because that section of the internal affairs report is discussing a time later in the interaction between Chapdelaine and Defendants.

position on the ground." ECF No. 56-3 at 3; *id.* at 13, 15-16. Once Chapdelaine was on the

ground, Desjardin struggled to secure her in handcuffs because she was hiding her left hand, but

eventually Desjardin was able to place Chapdelaine in handcuffs. ECF No. 56-3 at 3, 13, 15-16.

With the help of Deojay, Desjardin then lifted Chapdelaine from the ground and escorted her to

his patrol vehicle. *Id.* at 3, 16. Throughout this altercation, Desjardin repeatedly ordered

Chapdelaine to stop resisting but she failed to do so. *Id.* at 13, 16.

Chapdelaine recalls this altercation differently. In her recollection, supported by

admissible evidence in the record, she did not swing her cell phone into Desjardin's face. ECF

No. 63-2 at 54 (internal affairs report where Deojay reportedly says he did not think that

Chapdelaine "physically brought the phone up to Trooper Desjardin's face").  Instead,

"Chapdelaine had her phone up walking toward Trooper First Class Desjardin, as Trooper First

Class Desjardin started walking toward her, told her to get the phone out of his face, and swatted

the phone out of her hand." ECF No. 63-2 at 56; *see* ECF No. 56-6 at 10:37:22-10:37:25am

(video shows Desjardin take several steps off camera in the direction Chapdelaine walked earlier

in the recording and audio records Desjardin, off camera, saying "out of my face"). When

Desjardin "walked toward" Chapdelaine, she "stepped back." ECF No. 63-2 at 60. Chapdelaine

did not disobey Desjardin's order to remove her phone from his face, as she "never received any

directives or commands from TFC Desjardin before being physically taken to the ground." ECF

No. 63-7 at 4 ¶ 23. And when Desjardin arrested Chapdelaine, she did not resist Desjardin's

efforts to handcuff her while she was standing or while she was on the ground. ECF No. 56-5 at

70 (testifying she did not resist Desjardin's "efforts to handcuff" her); *id.* at 171-72 (correcting

deposition answers to state "no" in response to whether she resisted "efforts by Trooper

Desjardin to arrest [her] that day" and "no I did not" in response to whether she "refused to cooperate with the responding troopers").

Despite this, Chapdelaine states, Desjardin took her "to the ground physically placing his knees in [her] back holding [her] down and reinjuring [her] leaving [her] with spinal damage, bowel incontinent, both shoulders sustained injuries, [her] left elbow, and both [her] wrists all injured at the hands of TFC Desjardin." ECF No. 63-7 at 6 ¶ 31. Desjardin placed "both his knees in [Chapdelaine's] lower back" before moving one to her "right shoulder." *Id.* at 1 ¶ 2. Desjardin used this amount of force without providing any warning to Chapdelaine, who "never received any directives or commands from TFC Desjardin before being physically taken to the ground." *Id.* at 4 ¶ 23. Deojay "witnessed th[is] assault" upon Chapdelaine but "failed to intervene or assist" her. *Id.* at 3 ¶ 13. After Desjardin placed Chapdelaine in handcuffs, Desjardin and Deojay lifted Chapdelaine off the ground "backwards" by her "wrist and arms," which injured her "shoulders and spine more." *Id.* at ¶ 14; *accord* ECF No. 63-14 at 34-35 (Serwecki stating in deposition that Chapdelaine was picked up from the ground "by the handcuffs" and was "screaming and yelling" that she was in pain). Desjardin and Deojay then escorted Chapdelaine to Desjardin's patrol vehicle. ECF No. 56-3 at 3, 16.

The parties' accounts converge after Desjardin and Deojay secured Chapdelaine in Desjardin's patrol vehicle. Chapdelaine was arrested for simple assault and disorderly conduct, ECF No. 56-3 at 2. She was then transported to Troop D by Desjardin. ECF No. 56-8 at 3 ¶ 18; ECF No. 63-17 at 5 ¶ 18 (Chapdelaine admits). Deojay remained at Chapdelaine's home and interviewed Serwecki and Demello, receiving written statements from them. *Id.*[5] At Troop D,

---

[5] The statements were primarily about the events that occurred before Desjardin and Deojay arrived at Chapdelaine's home. These events are contested by both parties but are not discussed in detail here because the facts are immaterial to this ruling.

Chapdelaine was charged with "Interfering/Resisting Arrest in violation of Connecticut General Statute §53-167a, Assault in the third degree of an elderly victim in violation of Connecticut General Statute §53a-61a, and Disorderly Conduct in violation of Connecticut General Statute §53a-182." ECF No. 56-8 at 4 ¶ 33; ECF No. 63-17 at 6-7 ¶ 33 (Chapdelaine admitting). While Chapdelaine was at Troop D, she requested to speak with the supervisor, who that day was Defendant Gregorzek. ECF No. 56-3 at 17. Gregorzek was not present at Chapdelaine's residence on the day of her arrest. ECF No. 56-8 at 4 ¶ 32; ECF No. 63-17 at 6 ¶ 32 (admitting in part and not citing any evidence that he was present). She was released hours later on the same day as her arrest. ECF No. 56-8 at 4 ¶ 34; ECF No. 63-17 at 7 ¶ 34 (Chapdelaine admitting). The charges against Chapdelaine are still pending. *State v. Chapdelaine*, Docket No. W11D-CR18-0163081-S.

## II.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party

carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.   DISCUSSION

Chapdelaine argues that her arrest on November 22, 2018, violated the Fourth Amendment because it was made without probable cause and with excessive force. Her probable cause allegations are brought under 42 U.S.C. § 1983 as false arrest, false imprisonment, and malicious prosecution claims. She also states a separate Fourth Amendment excessive force claim under § 1983, arguing that Desjardin and Deojay used excessive force during her arrest, and that Deojay violated the Fourth Amendment by failing to intervene during Desjardin's use of excessive force. Separately, Chapdelaine alleges that all Defendants violated several provisions of state law.[6] I will first address Chapdelaine's § 1983 claims related to probable cause, before turning to her excessive force claims, claims against Defendant Gregorzek, and state law claims.

### A.   Fourth Amendment Claims Against Desjardin and Deojay

#### 1.   False Arrest, False Imprisonment, and Malicious Prosecution

In the Second Circuit, § 1983 claims for false arrest and malicious prosecution "to vindicate the Fourth . . . Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citations omitted). Similarly, state law determines "the validity . . . of a federal civil rights claim based on false imprisonment" brought under § 1983. *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007). To state valid claims for false arrest, false imprisonment, and malicious prosecution, Chapdelaine must

---

[6] I dismissed some of Chapdelaine's state law claims in a prior ruling. *See* ECF No. 48.

therefore "plead an unreasonable deprivation of liberty in violation of the Fourth Amendment and satisfy the state law elements of the underlying claims." *Walker v. Sankhi*, 494 F. App'x 140, 142 (2d Cir. 2012) (summary order).

### a. Favorable Termination Requirement

"Under Connecticut law, [f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Russo*, 479 F.3d at 204 (citations and quotation marks omitted). The "applicable law for false arrest and false imprisonment 'is identical.'" *Id.* (citation omitted). To succeed on a false arrest or false imprisonment claim, the underlying charges must have been terminated in the plaintiff's favor. *Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011) (summary order) (citing *Roesch v. Otarola*, 980 F.2d 850, 853-54 (2d. Cir 1992)) (noting favorable termination is an element of a section 1983 claim "sounding in false imprisonment or false arrest" under Connecticut law). Similarly, for a claim of malicious prosecution the plaintiff must prove several elements, one of which is that the underlying "criminal proceedings have terminated in favor of the plaintiff." *Spak v. Phillips*, 857 F.3d 458, 461 n.1 (2d Cir. 2017) (citation omitted). Though a plaintiff need not "show that the criminal prosecution ended with some affirmative indication of innocence," he or she must "show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022).

The Connecticut Judicial Branch website shows that the charges stemming from Chapdelaine's arrest on November 22, 2018, are still pending. *See State v. Chapdelaine*, Docket No. W11D-CR18-0163081-S.[7] On February 15, 2022, they were placed on the trial list, but no

---

[7] Available at https://www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending&Key=6260f9f3-a203-47d9-bcf8-381fff134d4a. I may take judicial notice of litigation in other courts. *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (citation and internal quotations omitted) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings").

trial date is shown on the state court's website. *Id.* No reasonable jury could find that these charges have been favorably terminated on the available record. Because these underlying charges have not terminated, Chapdelaine's § 1983 claims for false arrest, false imprisonment, and malicious prosecution are not cognizable at this time.[8]

### 2. Probable Cause

#### a. False Arrest and False Imprisonment

Even if Chapdelaine could establish favorable termination, Defendants are not liable for false arrest or false imprisonment because the undisputed facts show that Desjardin and Deojay had probable cause to arrest Chapdelaine for at least one crime. Probable cause defeats a claim of false arrest or false imprisonment. *Williams v. Town of Greenburgh*, 535 F.3d 71, 78-79 (2d Cir. 2008) (citations omitted) (holding that because there was probable cause to arrest plaintiff, plaintiff was not deprived of a constitutional right and so could not succeed on false arrest claim). An officer has probable cause to arrest when he or she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (citations omitted). To determine whether probable cause existed for an arrest, I assess "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest" for any offense.

---

[8] Defendants also argue that Chapdelaine's claims challenging probable cause are unripe and that the Court thus lacks jurisdiction to entertain them because the criminal case remains pending. I disagree. Chapdelaine's claims do not present "abstract disagreements" that would require me to "declar[e] the meaning of the law in a vacuum." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687-88 (2d Cir. 2013) (internal quotation marks and citation omitted). All the facts necessary to decide the probable cause challenges are before the Court and, indeed, concern events that occurred almost four years ago. The fact that something that might occur in the future would improve Chapdelaine's chances of prevailing on one of those claims (in particular, malicious prosecution) by helping her establish an element of the claim does not pose a bar to this Court's subject matter jurisdiction. Indeed, the presence of favorable termination as an element of these probable cause challenges contemplates that courts will exercise jurisdiction over them precisely to decide — on the merits — whether the underlying proceeding has terminated.

*Ackerson v. City of White Plains*, 702 F.3d 15, 19-20 (2d Cir. 2012) (citations omitted). Probable cause need not exist for the charge "actually invoked by the arresting officer at the time of the arrest." *Id.* at 20 (citations omitted). A defendant police officer prevails on a false arrest claim "if there was probable cause to arrest Plaintiff[ ] for any single offense." *Id.* (citations omitted).

Here, Desjardin and Deojay had probable cause to arrest Chapdelaine for assault of an elderly victim based on undisputed facts. Under Connecticut law, it is a crime when anyone, "with intent to cause physical injury to another person . . . causes such injury to such person" and that person "has attained at least sixty years of age." *See* Conn. Gen. Stat. §§ 53a-61, 53a-61a. Desjardin and Deojay were first informed of the possible assault of Serwecki through the dispatch call made after Demello's 911 call.[9] "A dispatch call may be a factor supporting probable cause if it is 'sufficiently corroborated.'" *Gatling v. West*, 850 F. App'x 91, 94 (2d Cir. 2021) (summary order) (citing *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007)) (stating this but finding insufficient corroboration because the call was contradicted by on-scene observations); *see also Ziming Shen v. City of New York*, 725 F. App'x 7, 13 (2d Cir. 2018) (holding probable cause existed where victim made 911 report and when officers arrived victim had bloody nose, damaged camera, and stated again he was assaulted). And it is well-established "that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness . . . unless the circumstances raise doubt

---

[9] I resolve all disputes and ambiguities in favor of the non-moving party, Chapdelaine, and so do not assume that the officers knew all the facts from the 911 call. I adopt only the facts that are unambiguous and undisputed based on the 911 dispatch transcript and computer-assisted dispatch system record. *See* ECF No. 63-17 at 2 ¶ 3 (Chapdelaine admitting to dispatch of Deojay, denying without citation dispatch of Desjardin, and failing to mention CAD remarks). To the extent it is unclear which officer (i.e., Desjardin or Deojay) knew which facts, "under the collective or imputed knowledge doctrine, an arrest . . . is permissible where the actual arresting . . . officer lacks the specific information to form the basis for probable cause . . . but sufficient information to justify the arrest . . . was known by other law enforcement officials initiating . . . the investigation" and "the other officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (citations and quotations omitted).

as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citations

omitted).  Chapdelaine does not dispute that Desjardin and Deojay responded to a dispatch call

directing them to Chapdelaine's residence due to "a disturbance." ECF No. 56-2 at 6; *see* ECF

No. 63-17 at 2 ¶ 3 (Chapdelaine admitting to dispatch of Deojay and denying without citation

dispatch of Desjardin). Nor does she dispute the information given by an eyewitness, Demello,

that was communicated to Desjardin and Deojay through the CAD remarks. *See* ECF No. 63-17

at 1-2 ¶¶ 1-3 (Chapdelaine failing to mention CAD remarks and admitting information in the 911

call). Based on the dispatch information and CAD remarks, Desjardin and Deojay were informed

before arrival that they were responding to a disturbance, that Serwecki was 75 years old and

intoxicated, and that Chapdelaine was pushing him down. ECF No. 56-2 at 8. There are no facts

suggesting that Desjardin or Deojay had reason to question the veracity of Demello at the time

she made the initial report, so the information from the dispatch call and CAD remarks supports

the probable cause determination of Desjardin and Deojay.[10]

It is also undisputed that when Desjardin and Deojay arrived at Chapdelaine's home, the

dispatch call and CAD information were corroborated by on-scene observations. Desjardin and

Deojay first observed Serwecki standing outside with bleeding hands and Chapdelaine near him.

Shortly after their arrival, Chapdelaine began speaking over Serwecki and the officers, while

Serwecki twice stated that he did not want to be at Chapdelaine's home. Serwecki also stated that

he had fallen in response to a question about the blood on his hands.[11] Both officers observed

that Chapdelaine and Serwecki smelled of alcohol. These on-scene observations corroborated the

---

[10] Chapdelaine's argument that Demello is not credible because she is a felon and drug addict is not relevant to the probable cause determination because there is no evidence that any of the officers involved knew these facts at the time of arrest.
[11] That statement is not, as Chapdelaine suggests, inconsistent with the CAD report that Chapdelaine pushed Serwecki down. For all the officers knew, Serwecki fell after Chapdelaine pushed him down.

dispatch information — Deojay and Desjardin observed an injured, elderly man near Chapdelaine who confirmed he had fallen to the ground and stated that he did not want to be at Chapdelaine's home anymore, suggesting a conflict had occurred. "Information about criminal activity provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated." *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994) (noting this but finding no probable cause because information was not provided by a victim or eyewitness and was not corroborated by on-scene observations).[12] Based on the undisputed contents of the dispatch call and CAD remarks, corroborated by undisputed on-scene observations, a reasonably cautious person would have believed that Chapdelaine had assaulted the elderly Serwecki. Desjardin and Deojay thus had probable cause to arrest Chapdelaine for assault of an elderly victim. Chapdelaine has not provided any evidence from which a reasonable jury could conclude otherwise.

---

[12] The 911 call was made by an eyewitness, Demello, who spoke to Trooper Esposito. ECF No. 63-2 at 27. The eyewitness information obtained by Trooper Esposito was then conveyed to Desjardin and Deojay in the dispatch call and CAD remarks. It is not obvious on this record that Desjardin and Deojay knew that the information came from an eyewitness, though contextual clues suggest the information came from someone with present knowledge of the incident. The dispatch call notified both officers about the incident in the present tense, suggesting that the report was made by someone with current knowledge of the incident. ECF No. 56-2 at 6 (Serwecki "is intoxicated and is arguing with Darlene Chapdelaine"). The CAD remarks were also written in the present tense, informing Desjardin and Deojay that the 911 caller "is reporting" that at the time of dispatch Serwecki "is intoxicated" and "Darlene Chapdelaine is pushing him down." ECF No. 56-2 at 8. Both Desjardin and Deojay were also informed by Trooper Esposito about the 911 call in person shortly before they departed to Chapdelaine's home. Desjardin recalls being notified by Trooper Esposito in person that "there was a disturbance" at Chapdelaine's residence and "that the elderly male was assaulted." *Id.* at 58. Deojay remembers Trooper Esposito notifying him about the disturbance in person but could not recall the specific information conveyed by this notification. *Id.* at 53. But there is no specific evidence cited by Chapdelaine or Defendants that the officers were told that the information in the dispatch call and CAD remarks came from an eyewitness.

Even if the officers did not know the specific source of the information in the dispatch call and CAD remarks, they had no reason to question its reliability. And, as discussed above, it was corroborated by the officers' on-scene observations of Serwecki's bloody hands, Chapdelaine speaking over Serwecki and the officers, Serwecki stating that he did not want to be at Chapdelaine's home, Serwecki confirming that he had fallen when asked about the blood on his hands, and the officers' detection of alcohol on Chapdelaine and Serwecki. These observations suggest the information in the dispatch call and CAD remarks was reliable, supporting a finding that probable cause to arrest existed based on this information and the officers' on-scene observations.

At the very least, Desjardin and Deojay are entitled to qualified immunity on Chapdelaine's claims of false arrest and false imprisonment because they had, at a minimum, "arguable probable cause" to arrest Chapdelaine for assault of an elderly victim. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (citations and internal quotations omitted). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Id.* (citations and quotations omitted). Qualified immunity "affords government officials 'breathing room' to make reasonable — even if sometimes mistaken — decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is forgiving and protects all but the plainly incompetent or those who knowingly violate the law." *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (citation and internal quotations omitted). A police officer is entitled to qualified immunity for claims of false arrest and false imprisonment when he or she "can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (citations and internal quotations omitted). Here, at a minimum, officers of reasonable competence could disagree about whether probable cause existed to arrest Chapdelaine for assault on an elderly victim based on the information about a "disturbance," the CAD remarks, and the on-scene observations of Desjardin and Deojay that

confirmed the contents of the dispatch call and CAD remarks. Desjardin and Deojay are thus also entitled to qualified immunity on Chapdelaine's claims of false arrest and false imprisonment.

Chapdelaine focuses her probable cause arguments in two areas: (1) disputing the events that occurred before Deojay and Desjardin arrived at her home, and (2) commenting on the uncertainty these officers expressed about the existence of probable cause to arrest Chapdelaine for disorderly conduct or assault in interviews conducted months after the arrest. *See, e.g.,* ECF No. 63 at 10-12 (arguing that Serwecki was not assaulted by Chapdelaine); *id.* at 8-9, 32-33 (claiming that statement by Deojay in interview conducted several months after arrest that probable cause to arrest for disorderly conduct probably did not exist was dispositive of probable cause inquiry). First, Chapdelaine misunderstands the required probable cause analysis, which focuses objectively on the facts and information known to Desjardin and Deojay when they arrested her, not the facts as they actually were. Her arguments about whether an assault occurred before the arrival of Desjardin and Deojay are thus not relevant unless the facts she alleges were known to the officers, and she has presented no evidence from which a reasonable jury could conclude this was the case.

Chapdelaine's second argument concerning the subjective belief about probable cause held by Desjardin and Deojay months after the arrest occurred is similarly mistargeted, as it ignores both the objective nature of the probable cause inquiry and my duty to determine whether there was probable cause to arrest for *any* offense, not just the disorderly conduct and assault charges for which Chapdelaine was initially arrested. I must analyze probable cause through an objective lens without considering the subjective beliefs of the arresting officers. *See United States v. Gagnon*, 373 F.3d 230, 239 (2d Cir. 2004) ("a law enforcement officer's mistaken belief that probable cause did not exist at the time is irrelevant to a court's later

determination of whether probable cause existed at the time"). Chapdelaine's argument about what Desjardin and Deojay thought about probable cause three months after her arrest is thus irrelevant. Further, the lack of probable cause for a particular charge does not a claim for false arrest make, as long as there was probable cause to arrest Chapdelaine for some offense; thus, an officer's own later assessment — even if it could be considered — that he lacked probable cause with respect to one of several charges against a plaintiff would not be dispositive.

Even when I construe the evidence and any ambiguities in the record in Chapdelaine's favor, she fails to show that there is a genuine dispute of material fact as to what Desjardin and Deojay knew at the time of the arrest because she does not attempt to challenge their knowledge before the arrest. *See* ECF No. 63-17 at 1-2 ¶¶ 1-3 (failing to address the CAD remarks or dispatch call); *id.* at 2 ¶ 4 (denying without adequate explanation or citation Defendants' claim about what Desjardin and Deojay saw when they arrived on-scene, and instead disputing whether Serwecki was assaulted). Chapdelaine provides no evidence that disputes the officers' on-scene observations and knowledge, so there is no dispute about a material fact. Because the available evidence establishes that there was probable cause, or at least arguable probable cause, to arrest Chapdelaine for assault of an elderly person, Deojay and Desjardin are entitled to judgment on Chapdelaine's false arrest and false imprisonment claims for this reason in addition to their favorable termination argument. I therefore dismiss the false arrest and false imprisonment claims with prejudice.

### b.  Malicious Prosecution

Generally, "in the absence of exculpatory facts which became known after an arrest, probable cause to arrest is a complete defense to a claim of malicious prosecution." *D'Angelo v. Kirschner*, 288 F. App'x 724, 726 (2d Cir. 2008) (summary order). But a "finding of probable

16

cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor." *D'Angelo*, 288 F. App'x at 726-27; *see, e.g., Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989) (plaintiff acquitted on charge of resisting arrest could pursue malicious prosecution claim on that charge even though he was convicted on disorderly conduct charge stemming from events that led to arrest because "[a]llowing police officers to add unwarranted misdemeanor charges to valid violation charges may force an accused to go to trial on the misdemeanor when he otherwise would plead to the violation. If the dispositive factor is whether . . . the charge resulting in acquittal 'arose out of events that occurred on the same occasion' as a charge resulting in conviction, then police officers could add unsupported serious charges to legitimate minor charges with impunity").

Here, as noted above, there was probable cause to arrest Chapdelaine for assault on an elderly person, a claim that is still pending in state court. *State v. Chapdelaine*, Docket No. W11D-CR18-0163081-S. As I discuss below, though, there are disputes of fact as to the conduct of Chapdelaine, Desjardin, and Deojay during the time immediately preceding and during the arrest.[13] This conduct is central to the probable cause analysis for both the arrest and charging decisions in Chapdelaine's other two pending charges for disorderly conduct and interfering with an officer; the basis for these charges is Chapdelaine's conduct at the time of arrest, and so material disputes about it prevent me from granting summary judgment on the probable cause

---

[13] There are also significant factual disputes about whether the prosecution for assault on an elderly person was malicious based on events that occurred after Chapdelaine's arrest. Chapdelaine submits evidence she claims is exculpatory for the assault on an elderly person charge. *E.g.*, ECF No. 63-14 at 26-29 (deposition of Serwecki in which he recants the statement he gave to police and claims Chapdelaine never hit or assaulted him). Yet Defendants provide evidence that Chapdelaine sought to influence both Serwecki and Demello to recant their statements. ECF No. 56-8 at 5 ¶¶ 36-40. On the strength of this evidence, Chapdelaine has been charged with felony tampering with a witness. *State v. Chapdelaine*, Docket No. W11D-CR19-0163668-S. At this stage of the proceedings, I decline to decide whether a reasonable jury could find that probable cause to prosecute for assault on an elderly person continued to exist after these facts became known because it is not necessary to do so unless the pending charges terminate in her favor. Therefore, as discussed below, I stay this case pending resolution of the criminal proceedings.

17

component of the malicious prosecution claims.[14] For now, as noted, Chapdelaine's malicious prosecution claims fail on favorable termination grounds. Because Chapdelaine's pending state charges may yet be terminated in her favor, however, and because, as discussed below and in footnote 13, I do not agree with Defendants' argument that there are no genuine disputes of material fact relevant to the malicious prosecution claims, I dismiss Chapdelaine's malicious prosecution claims without prejudice. Chapdelaine may reassert her malicious prosecution claims if one or more of the underlying charges terminates in her favor.

### 3. Excessive Force

Defendants argue that there is no genuine dispute of material fact as to whether Desjardin and Deojay used excessive force against Chapdelaine during her arrest. I disagree and therefore must deny summary judgment on Chapdelaine's excessive force claims.

"The Fourth Amendment's protection against unreasonable seizures prohibits the use of excessive force by police officers in arresting suspects." *Orr v. Waterbury Police Dep't*, No. 3:17-CV-788 (VAB), 2018 WL 780218, at *5 (D. Conn. Feb. 8, 2018) (citing *Hemphill v. Scott*, 141 F. 3d 412, 416-17 (2d Cir. 1998)). "Determining whether a use of force was 'reasonable' under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must ask "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id. (*citations and internal quotations omitted). In doing so, a court must "consider

---

[14] I do not reach Defendants' qualified immunity defense on this claim because it would be a waste of judicial resources to do so unless and until the prosecution of one of these underlying charges is terminated favorably to Chapdelaine.

'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (citations omitted). These are often called the *Graham* factors. The record must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citations and quotations omitted).

Defendants argue that the *Graham* factors suggest Desjardin and Deojay used reasonable force to arrest Chapdelaine. There is no dispute about the severity of the crime for which the officers were first called, assault. On officer safety, Defendants argue that Chapdelaine posed an immediate threat to officer safety because she moved closer to Desjardin and Deojay, ignored direct commands, swung her phone at Desjardin, and was intoxicated. *See* ECF No. 56-1 at 17-18. Chapdelaine, however, points to evidence suggesting that Desjardin approached her as she was walking towards him, ECF No. 63-2 at 56, that she did not swing her cell phone at Desjardin, ECF No. 63-2 at 54, and that she did not ignore any of his commands before Desjardin chose to arrest her by force, ECF No. 63-7 at 4 ¶ 23. There is also evidence in the record suggesting that Chapdelaine announced shortly after the officers arrived that she was handicapped, ECF No. 56-6 at 10:37:04-10:37:11am, and had just undergone major back surgery so significant she needed help to move her dog inside of her home, *id.* at 10:36:45-10:37:17am. Desjardin acknowledged this statement about Chapdelaine's surgery and her resulting fragility by telling her that he "didn't care." *Id.* at 10:37:10-10:37:17am. At this stage, I must resolve all inferences and ambiguities in Chapdelaine's favor. A reasonable jury accepting Chapdelaine's version of events could find that Chapdelaine was no threat to Desjardin and Deojay and that her comments and conduct on the scene only confirmed this.

On the nature and extent of Chapdelaine's alleged resistance, Defendants provide evidence showing that Chapdelaine "actively resisted arrest such that it took two police officers to successfully take her into custody." ECF No. 56-1 at 18. In their view, Chapdelaine resisted being handcuffed while standing, ECF No. 56-8 at 2 ¶ 12, and after Desjardin forced her to the ground, ECF No. 56-3 at 3, 13, 15-16. These facts, however, are disputed. Chapdelaine provides evidence supporting her claims that she was given no warnings before arrest, ECF No. 63-7 at 4 ¶ 23, did not resist Desjardin's efforts to handcuff her while standing, ECF No. 56-5 at 70, and despite this was thrown to the ground, ECF No. 63-7 at 6 ¶ 31. She also points to evidence that, once on the ground, she did not resist Desjardin's efforts to handcuff her, ECF No. 56-5 at 70, yet she was still forcefully restrained by a knee to her back that left her with serious injuries, ECF No. 63-7 at 6 ¶ 31, before being carried painfully to Desjardin's patrol vehicle, *id.* at 3 ¶ 14.

A reasonable jury could find that forcing Chapdelaine to the ground and using a knee to restrain her was objectively unreasonable if Chapdelaine was not resisting arrest. *See Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (citations omitted) (it is well established that "the use of entirely gratuitous force is unreasonable and therefore excessive"); *Muschette on Behalf of A.M. v. Gionfriddo*, 910 F.3d 65, 69-70 (2d Cir. 2018) (citing with approval a district court decision that held "it [is] a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resisted arrest or posed a threat to officer safety"). And even were Chapdelaine not completely compliant with her arrest, a claim that the parties offer contradictory facts on, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit." *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2020) (emphasis in original). Here, the extent of Chapdelaine's resistance to arrest is disputed. Viewing the evidence

in the light most favorable to Chapdelaine, a reasonable jury could find that the force used by Desjardin was excessive.

Though Deojay was not involved with the initial portion of Chapdelaine's arrest, Chapdelaine provides evidence suggesting that he failed to intervene while Desjardin used excessive force and then assisted in moving Chapdelaine to Desjardin's cruiser with excessive force. Drawing all inferences in Chapdelaine's favor, a reasonable trier of fact could conclude that Deojay should have prevented Desjardin from using excessive force. It is "widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence, and a police officer is liable for failing to intercede when excessive force is being used when there was a realistic opportunity to intervene to prevent the harm from occurring." *Simcoe v. Gray*, 577 F. App'x 38, 40 (2d Cir. 2014) (internal quotation marks omitted) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). A reasonable jury could find that Desjardin used excessive force against Chapdelaine, that Deojay — who was not otherwise occupied and was so close to the arrest he was able to help Desjardin lift Chapdelaine from the ground and transport her to a vehicle — had a realistic opportunity to intervene, and that Deojay failed to do so.

Defendants also argue they are entitled to qualified immunity on Chapdelaine's excessive force claim.[15] This argument depends on whether, on November 22, 2018, it was "clearly impermissible . . . under the circumstances presented for a police officer to use the force that a jury could find [Defendants] used" based on the evidence in the record viewed in the light most favorable to Chapdelaine. *Lennox*, 968 F.3d at 156. In this light, the evidence shows that Desjardin

---

[15] I recognize that Chapdelaine failed to address this line of argument in her memorandum of law opposing summary judgment. *See* ECF No. 63. Nevertheless, I may grant summary judgment only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Chapdelaine's failure to respond to Defendants' arguments is thus not dispositive here.

caused serious injury by taking down an arrestee not actively resisting arrest, kneeling on top of her, handcuffing her, and then lifting her to her feet by her handcuffed wrists and arms. The use of such force was "clearly impermissible" in November 2018 under Second Circuit case law.

In the Second Circuit, it is clearly established "that it is a Fourth Amendment violation for a police officer to use significant force against an arrestee who is no longer resisting and poses no threat to the safety of officers or others." *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020) (citation omitted) (clearly established since before April 2015); *see Lennox*, 968 F.3d at 157 (affirming denial of qualified immunity on excessive force claim where reasonable jury could find handcuffed plaintiff not resisting when force was used). A reasonable jury could find that the force used against Chapdelaine was significant. *Cf. Lennox*, 968 F.3d at 156 (reasonable jury could find unreasonable force where officer put full body weight on prone defendant by kneeling on her back and slammed her head into the ground after defendant had been handcuffed and restrained). And it could also find that Chapdelaine was no longer resisting and posed no threat to Desjardin, Deojay, or any bystanders, either before she was thrown to the ground and restrained or after she was handcuffed when the officers lifted her from the ground by her wrists and arms. *Cf. Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015) (reversing grant of qualified immunity because "no officer in 2009 could reasonably have believed it permissible under the Fourth Amendment to jump on the back of a prone and compliant suspect gratuitously, with sufficient force to break his spine and rib"). Because a reasonable jury could find significant force was used against a non-resisting arrestee on the record viewed in the light most favorable to Chapdelaine, I cannot say that Desjardin did not violate clearly established law and so is entitled to summary judgment on his qualified immunity defense.

As for Deojay's defense of qualified immunity on Chapdelaine's failure to intervene claim, "for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557. He will thus be liable only if he could have interceded and his failure to intercede "permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (citation and internal quotations omitted). Viewing Chapdelaine's evidence in the light most favorable to her, a reasonable jury could find that Deojay had a realistic opportunity to intervene because he was not occupied with other duties while this arrest occurred, was physically close to the arrest, and there were no other suspects present to distract him. *Cf. Lennox*, 968 F.3d at 158 (reversing denial of qualified immunity to officer near arrest because that officer was "engaged in crowd control" and there was no evidence that suggests officer had realistic opportunity to intervene that he then disregarded). And as I discussed above, a reasonable jury could find that Desjardin violated a clearly established constitutional right. There are thus factual disputes that prevent me from granting qualified immunity to Desjardin and Deojay at this stage of the proceedings.

"[I]n light of the fact-specific nature of the inquiry on an excessive force claim, granting summary judgment against a plaintiff on such a claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Lennox,* 968 F.3d at 155 (citations omitted). A reasonable jury could find the force used to arrest Chapdelaine objectively unreasonable based on the record viewed in the light most favorable to Chapdelaine.[16] Summary judgment for Defendants on Chapdelaine's § 1983 excessive force claim is thus denied.

---

[16] Defendants argue that I should draw an adverse inference from Chapdelaine's assertion of her Fifth Amendment rights during her deposition. ECF No. 56-1 at 18-19. "A defendant in a civil proceeding who invokes the Fifth Amendment as a result of an overlapping criminal investigation or proceeding 'risk[s] the adverse inference arising from [his or her] assertion of the privilege.'" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97–98 (2d

### B.      Fourth Amendment Claims Against Defendant Gregorzek

Because he was not present at the scene on November 22, 2018, no reasonable jury could find that Defendant Gregorzek violated Chapdelaine's Fourth Amendment rights when she was arrested. He is thus entitled to judgment on these §1983 claims as a matter of law. A plaintiff must directly "prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (citations and internal quotations omitted). As Defendants note in their memorandum of law, there is no evidence in the record that Gregorzek was personally involved in the arrest of Chapdelaine. ECF No. 56-1 at 5. Chapdelaine, in disputing Defendants' statement that Gregorzek was never present at Chapdelaine's home, fails to cite any evidence. ECF No. 63-17 at 6 ¶ 32. No reasonable jury could find that Gregorzek was involved in taking Chapdelaine into custody on this record.

Chapdelaine's other allegations against Gregorzek under the Fourth Amendment appear to be variants of her malicious prosecution claim. *See, e.g.,* ECF No. 26 at 59-60, ¶¶ 210-11

---

Cir. 2012) (citations omitted). The party who asserts this privilege "must bear the consequence of lack of evidence, and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *Id.* at 98 (citations and quotations omitted). At this stage in the proceedings, however, the adverse consequence of Chapdelaine's asserting her Fifth Amendment privilege is that she is not freed by doing so from "adducing proof in support of a burden which would otherwise have been [hers]." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995) (citations omitted). Despite her Fifth Amendment assertion, Chapdelaine has provided sufficient evidence from other sources to show there is a dispute of material fact about the objective reasonableness of the force used during her arrest. Chapdelaine's evasive answers during and after her deposition may bear on her credibility, but this is a question for the trier of fact at trial, not for me at summary judgment.

Also, the adverse inference analysis requires me to consider the "potential for harm or prejudice" caused by the privilege assertion. *Id.* at 84 (citations omitted); *see also Donoghue v. Retrophin, Inc.*, No. 14CV7640ERMHD, 2015 WL 13882435, at *2 (S.D.N.Y. July 20, 2015) ("the decision whether to draw the inference will turn at least in major part on whether invocation of the privilege has prevented the other side from obtaining relevant information"). Defendants have asked for the adverse inference but only discussed how Chapdelaine "selectively asserted her privilege" without identifying the harm or prejudice resulting from this assertion. *See* ECF No. 56-1 at 18-19. Any adverse inference warranted by Chapdelaine's assertion of privilege is thus not sufficient on this record to grant Defendants summary judgment.

(only count of complaint discussing post-arrest conduct in which Gregorzek was allegedly involved is titled Malicious Prosecution); *id.* at 14-15, 36 ¶¶ 51, 54, 125, 126 (alleging that Gregorzek lied in reports about Chapdelaine's arrest and misrepresented material facts); ECF No. 63 at 13-14, 24 (arguing in memorandum of law that Gregorzek misrepresented facts and filed false reports). As discussed above, I need not decide the substance of Chapdelaine's malicious prosecution claims because they fail on favorable termination grounds. The malicious prosecution claims against Gregorzek are thus dismissed without prejudice; Chapdelaine may reassert them if and when at least one of the underlying state charges terminates in her favor. [17]

### C.    Younger Abstention

Defendants also argue that this Court lacks jurisdiction to hear Chapdelaine's § 1983 action for damages and related state law claims under the *Younger* abstention doctrine. "*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger v. Harris*, 401 U.S. 37, 43-44 (1971). *Younger*, however, involved a request for equitable relief to *enjoin* a state court criminal

---

[17] Chapdelaine appears to argue in her memorandum of law that Gregorzek failed to provide adequate medical care while she was detained. See ECF No. 63 at 2, 16. To the extent these claims implicate federal law, they are properly brought under the Fourteenth Amendment deliberate indifference standard. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment . . . [a] pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions); *e.g.*, *Charles v. Orange Cnty.*, 925 F.3d 73, 88-89 (2d Cir. 2019) (applying this standard to a claim of inadequate medical care while in pretrial detention).Thus, any claims Chapdelaine brings against Gregorzeck under the Fourth Amendment related to her lack of medical care fail as a matter of law. And Chapdelaine has not asserted a deliberate indifference claim against Gregorzek under the Fourteenth Amendment. Chapdelaine's complaint does not include the phrase "deliberate indifference." *See* ECF No. 26. When the complaint mentions the Fourteenth Amendment, it does so in the context of excessive force, *e.g., id.* at 9, or as part of a cursory listing of many constitutional rights allegedly violated by defendants, e.g., *id.* at 11 ("in violation of her protected rights under the United States Constitution, 4th, 5th, 8th, 14th, and Articles 7, 8 and 9 of the Connecticut Constitution"). Chapdelaine's arguments about Gregorzek's involvement in providing her medical care thus fail to suggest any violation of a federal right. I do not address in this ruling whether they may be relevant to any of her remaining state law claims.

prosecution. *Younger*, 401 U.S. at 40 (considering a request for an injunction on constitutional grounds that would prevent a state official from continuing to prosecute plaintiff).

Although the Second Circuit has described the question whether *Younger* applies to federal actions seeking monetary relief when there are related ongoing state proceedings as "an open question," it has also "held that abstaining from cases involving efforts only to obtain money damages is inappropriate" because "*Younger* abstention focuses primarily on federal courts interfering with and disrupting ongoing state proceedings." *Jones v. Cnty. of Westchester*, 678 F. App'x 48, 50 (2d Cir. 2017) (summary order) (reversing district court's stay of federal action for monetary relief under *Younger* even where underlying state proceedings "may involve some of the same subject matter" as the federal suit because there was "little chance that a potential award of money damages would interfere with or disrupt" the state proceedings). And mandatory abstention under *Younger*, i.e., dismissal, is disfavored when the federal action asks for monetary relief. *See, e.g, Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir. 2000) (holding that mandatory dismissal under *Younger* "is not appropriate with respect to Kirschner's claim for money damages under § 1983 ... because it is a claim for money damages and not for declaratory or injunctive relief" but remanding to allow district court to consider whether a stay was appropriate pending conclusion of the state proceeding); *see also Rivers v. McLeod*, 252 F.3d 99, 101–02 (2d Cir. 2001) (per curiam) (mandatory dismissal under "the *Younger* doctrine is inappropriate where the litigant seeks money damages for an alleged violation of § 1983").

In this case, I dismissed the claim for injunctive relief because Chapdelaine failed to allege ongoing violations of law. ECF No. 48. At this stage, then, I am not *required* by *Younger* to dismiss Chapdelaine's claims for monetary relief on the ground that they are related to ongoing state criminal proceedings, as Defendants argue. *E.g., Torres v. Gaines*, 130 F. Supp. 3d

630, 636-37 (D. Conn. 2015) (granting a stay, not dismissal, and noting that "abstention principles . . . may be applied" if it is appropriate to the case). Any problems that may result from factual findings made at trial in this case will arise only if Chapdelaine's state charges have not been adjudicated by the time this case goes to trial. I am aware, however, that resolving Chapdelaine's claims in this case might "place[] the Court in the awkward position of having to question the validity of the underlying state proceedings, the sum and substance of [Chapdelaine's] claims." *Id.* at 637 (citations omitted). And because, as discussed above, Chapdelaine's malicious prosecution claims fail here because the underlying state criminal proceedings have not yet concluded, a stay would leave open the possibility of her trying those claims in this case. I thus stay Chapdelaine's claims for monetary relief under *Younger*. This case will be administratively closed with leave to reopen at the conclusion of the underlying state proceedings.

### D.    State Law Claims

Defendants argue the state law claims should be dismissed on jurisdictional grounds because, if they prevail at summary judgment on Chapdelaine's § 1983 claims, there will be no federal claims over which this Court has original jurisdiction. *See* ECF No. 56-1 at 21-22. As there is still at least one live federal claim, i.e., the excessive force claim under the Fourth Amendment, this argument fails. Defendants did not move on any other grounds for summary judgment on Chapdelaine's state law claims. Summary judgment on these claims is thus denied.

## IV.    CONCLUSION

For the reasons above, I grant in part and deny in part the motion for summary judgment (ECF No. 56).  The Clerk is directed to administratively close but not dismiss this case.

Chapdelaine is ordered to file a notice within 30 days of the final adjudication of her underlying state criminal charges setting forth the disposition of each charge.

IT IS SO ORDERED.

                              /s/
                      Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
       September 23, 2022